**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**CHARLOTTESVILLE DIVISION**

CLERKS OFFICE US DISTRICT COURT
AT CHARLOTTESVILLE, VA
FILED
October 16, 2026
LAURA A. AUSTIN, CLERK
BY: /s/ Nik Sams
DEPUTY CLERK

**360 PAINTING, LLC,**

and

**THE GROUT MEDIC, LLC,**

*Plaintiffs,*

v.

**360 PAINTING AND MORE, LLC,**

**JOHN WIESEHAN, III,**

**LANAI NORRIS,**

**JOSHUA FARMER,**

**JOHN WIESEHAN, JR.,**

and

**BELINDA WIESEHAN,**

*Defendants.*

Civil Action No. 3:26cv108

**COMPLAINT**

Plaintiffs 360 Painting, LLC ("*360 Painting*") and The Grout Medic, LLC ("*Grout Medic*") (together, the "*Franchisors*"), by counsel, state as follows for their Complaint against Defendants 360 Painting and More, LLC ("*P&M*"), John Wiesehan, III ("*Wiesehan*"), Lanai Norris ("*Norris*"), Joshua Farmer ("*Farmer*") (Wiesehan, Norris, and Farmer together, the "*Guarantors*"), John Wiesehan, Jr. ("*Wiesehan Jr.*"), and Belinda Wiesehan ("*Belinda Wiesehan*"):

## INTRODUCTION

1. P&M holds ten franchises: seven 360 Painting territories and three Grout Medic territories across North and South Carolina. Each Guarantor personally guaranteed every one of them and personally promised not to compete with the franchised businesses while the franchise agreements remained in force.

2. In 2026, while P&M was still operating under the Franchisors' marks, receiving the Franchisors' leads, and drawing on the Franchisors' systems, its owners stood up a competing painting company, Harding & Company, at P&M's own office suite. Harding & Company advertises interior, exterior, and commercial painting in five of P&M's seven 360 Painting territories.

3. In the same weeks, P&M let the Franchisors' weekly fee drafts go unpaid, refused to sign replacement payment authorizations it had promised to sign, stopped making the installment payments it owed for the Charleston territory, withheld the monthly financial reports it owed, and ignored an audit of its bank records.

4. The Franchisors terminated all ten franchise agreements for cause. They bring this action to stop Defendants' ongoing diversion of the Franchisors' customers and goodwill, to compel Defendants' post-termination obligations, and to recover the amounts Defendants owe, including the lost profits the franchise agreements expressly award when a franchisee fails to operate for the full term.

## PARTIES

5. Plaintiff 360 Painting, LLC is a Delaware limited liability company with its principal place of business at 126 Garrett Street, Suite J, Charlottesville, Virginia 22902. 360 Painting franchises a system for residential and commercial interior and exterior painting services under the 360 Painting marks.

6. Plaintiff The Grout Medic, LLC is a Delaware limited liability company with its principal place of business at 126 Garrett Street, Suite J, Charlottesville, Virginia 22902. Grout Medic franchises a system for grout, tile, and hard-surface cleaning, repair, and restoration services under The Grout Medic marks.

7. 360 Painting and Grout Medic are affiliates of Premium Service Brands, LLC, which manages franchise brands from its headquarters in Charlottesville, Virginia. No member of either Franchisor, traced through every tier of membership, is a citizen of North Carolina or South Carolina.

8. Defendant 360 Painting and More, LLC is a limited liability company with its principal office at 2201 Crownpoint Executive Drive, Suite G, Charlotte, North Carolina 28227. According to the franchisee information P&M certified to the Franchisors, its members are Apokar Investment Group, LLC, which holds a 90% interest, and Farmer, who holds the remaining 10%. On information and belief, Apokar Investment Group, LLC's members are Wiesehan and Norris. Each of P&M's members, traced through every tier of membership, is a citizen of North Carolina.

9. Defendant John Wiesehan, III is an individual who, on information and belief, resides at 1104 Longwood Court, Matthews, North Carolina 28104, and is a citizen of North Carolina. Wiesehan is a Managing Partner of P&M and signed each Franchise Agreement's Guaranty and Personal Covenants.

10. Defendant Lanai Norris is an individual who, on information and belief, resides at 1618 Pearlstone Lane, Matthews, North Carolina 28104, and is a citizen of North Carolina. Norris is a Managing Partner of P&M and a Guarantor of each Franchise Agreement.

11. Defendant Joshua Farmer is an individual who, on information and belief, resides at 9604 Machado Drive, Indian Trail, North Carolina 28079, and is a citizen of North Carolina.

Farmer is P&M's General Manager, owns 10% of P&M, and is a Guarantor of each Franchise Agreement.

12. Defendant John Wiesehan, Jr. is an individual who, on information and belief, is a citizen of North Carolina and may be served at 10205 US Highway 15-501, Unit 26, Suite 130, Southern Pines, North Carolina 28387, the notice address he designated in the Surrender Agreement described below. Wiesehan Jr. is an owner of Vesper Management Group, Inc., the former 360 Painting franchisee for the Pinehurst, North Carolina territory, and guaranteed that franchise.

13. Defendant Belinda Wiesehan is an individual who, on information and belief, is a citizen of North Carolina and may be served at 10205 US Highway 15-501, Unit 26, Suite 130, Southern Pines, North Carolina 28387, the notice address she designated in the Surrender Agreement. Belinda Wiesehan is an owner of Vesper Management Group, Inc. and guaranteed its Pinehurst franchise.

## JURISDICTION AND VENUE

14. This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a)(1). The Franchisors are citizens of states other than North Carolina and South Carolina, every Defendant is a citizen of North Carolina, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

15. Each 360 Painting Franchise Agreement provides that "[a]ny action brought by either party shall be brought in the appropriate state or federal court located in or serving county and state in which Franchisor maintains its principal place of business at the time any dispute resolution proceeding is commenced by either party (currently the City of Charlottesville, VA)," and that "[t]he parties waive all questions of personal jurisdiction or venue for the purposes of carrying out this provision." § 27.2(iii). Each Grout Medic Franchise Agreement contains the same

provision. § 27.2. The Franchisors' principal place of business is, and at all relevant times was, Charlottesville, Virginia, which this Court serves.

16. Each Guarantor separately submitted to the jurisdiction of this Court through the Personal Covenants and the Guaranty attached to each Franchise Agreement, each of which subjects the signer to suit in the federal court encompassing the Franchisors' headquarters and waives any objection to personal jurisdiction and venue there.

17. Wiesehan Jr. and Belinda Wiesehan agreed in the Surrender Agreement that all disputes arising from it shall be submitted to the state or federal courts located in or serving the City of Charlottesville, Virginia.

18. Venue is proper in this Division under 28 U.S.C. § 1391(b)(2) and the parties' forum-selection agreements. Each Franchise Agreement recites that it was accepted in Charlottesville, Virginia, and that Defendants' payment obligations would be performed there.

## FACTUAL BACKGROUND

*The Franchise Agreements*

19. P&M and the Guarantors entered into ten franchise agreements with the Franchisors (each a "Franchise Agreement"), as follows:

| Franchisor | Territory | Effective Date | Initial Term Ends |
|---|---|---|---|
| 360 Painting | Gastonia, NC | November 7, 2024 | November 7, 2034 |
| 360 Painting | Rock Hill, SC | November 7, 2024 | November 7, 2034 |
| 360 Painting | Lake Norman, NC | June 21, 2025 | June 21, 2035 |
| 360 Painting | Pinehurst, NC | November 5, 2025 | November 5, 2035 |
| 360 Painting | Greenville, SC | March 27, 2026 | March 27, 2036 |
| 360 Painting | Columbia, SC | March 27, 2026 | March 27, 2036 |
| 360 Painting | Charleston, SC | April 24, 2026 | April 24, 2036 |
| Grout Medic | Gastonia, NC | February 25, 2025 | February 25, 2035 |
| Grout Medic | Rock Hill, SC | February 25, 2025 | February 25, 2035 |
| Grout Medic | Pinehurst, NC | March 13, 2026 | March 13, 2036 |

20. True and accurate copies of the seven 360 Painting Franchise Agreements are attached as Exhibits 1 through 7, and of the three Grout Medic Franchise Agreements as Exhibits 9 through 11. Each Franchise Agreement has an initial term of ten years from its Effective Date. § 3.1.

21. Under each Franchise Agreement, P&M agreed to pay the Franchisor, weekly, a Royalty equal to the greater of $150 per week or six percent of Gross Sales, § 4.2; a Marketing Fund Contribution, § 4.3; a Contact Center Fee equal to the greater of two percent of Gross Sales or a weekly minimum, § 4.6; and a Technology Fee of $210 per week, § 4.7. The Royalty is due weekly throughout the entire term, "even if the Business has no revenue." § 4.2(i).

22. P&M agreed to pay these fees by automated bank draft, to execute the ACH Authorization attached to each Franchise Agreement and "such other documents as Franchisor may request from time to time" to authorize those drafts, and not to close the account from which the drafts were withdrawn without the Franchisor's written consent. § 5.2. P&M agreed that the Franchisor may audit its books and records. § 6.4.

23. Overdue payments bear interest at 1.5% per month, and the Franchisor may charge a $100 late fee for each overdue payment and a $100 fee for each draft the franchisee's bank does not honor. § 5.3.

24. P&M agreed to deliver monthly unaudited balance sheets and profit-and-loss statements, certified as true and correct, by the 21st day of each month. § 6.3. Under the Columbia, Greenville, and Charleston Franchise Agreements, P&M further agreed to participate in the Franchisors' Accounting and Business Advisory Services Program. § 6.1.

25. Each 360 Painting Franchise Agreement defines a "Competitive Business" as "any business operating, or granting franchises or licenses to others to operate, in any business which offers or sells painting, decorating and wall finishing services." § 18.1(iii).

26. P&M and every "Bound Party," which includes each of P&M's members and managers and their spouses, agreed that during the term of each Franchise Agreement they would not own any interest in, or perform services for, a Competitive Business located within the Protected Territory, within twenty miles of the Protected Territory, or within twenty miles of the primary office of any other 360 Painting business (or, under the Grout Medic Franchise Agreements, any other Grout Medic business). § 18.1(i). They agreed to the same restriction for two years after termination. § 18.1(ii). They agreed not to divert or solicit customers, § 18.2, and not to use or disclose the Franchisors' confidential information, including customer information, § 18.3.

27. P&M agreed that the Franchisor is entitled to an injunction, without bond, against any actual or threatened breach of these covenants, and that the post-term restriction is tolled during any breach. § 18.1(iv). Each Franchise Agreement also preserves the Franchisor's right to obtain restraining orders and preliminary and permanent injunctions against threatened conduct that may cause it loss. § 27.3.

28. Each Guarantor signed Personal Covenants, binding the Guarantor personally to the covenants in Section 18 and to the Franchise Agreement's dispute-resolution provisions as if those obligations were made by the Guarantor directly to the Franchisor. § 18.4.

29. P&M agreed not to carry on, or permit others to carry on, any other business at any location at which the franchised business operates without the Franchisor's written consent. § 21.

30. Gross Sales include all monies and receipts derived in connection with the franchised business, and P&M agreed that all revenues must be recorded upon receipt. § 4.4. P&M agreed to report its Gross Sales to the Franchisor with each weekly payment. § 6.3.

31. Wiesehan signed the Guaranty and Personal Covenants attached to each Franchise Agreement when it was executed. Norris signed them at execution of the Lake Norman, Columbia, Greenville, Charleston, and Grout Medic Pinehurst Franchise Agreements, and Farmer signed them at execution of the Columbia, Greenville, Charleston, and Grout Medic Pinehurst Franchise Agreements. As to the remaining Franchise Agreements, Norris, Farmer, or both executed Ownership Amendments, including on May 17, 2026, under which each became an additional franchisee, retroactively assumed all obligations of a member under the Franchise Agreement, and executed the Personal Covenants and Guaranty.

32. Under each Guaranty, the Guarantor personally, absolutely, and unconditionally guaranteed, jointly and severally, that P&M would punctually pay and perform every undertaking, condition, and covenant in the Franchise Agreement.

33. Each Franchise Agreement provides that the Franchisor shall be entitled to lost profits based on a failure of the franchisee to operate the business for the entire term of the agreement. § 27.4.

34. Each Franchise Agreement provides that a party who incurs expenses because of the other party's failure to pay amounts when due, to submit required reports when due, or otherwise to comply with the agreement, shall be reimbursed for those costs and expenses, including reasonable attorneys' fees. § 28.

*The Charleston Territory*

35. P&M acquired the Charleston Protected Territory from an existing 360 Painting franchisee. As a condition of that transfer, P&M agreed in a First Amendment to the Charleston

Franchise Agreement (Exhibit 8) to pay the transferor's $38,948.53 outstanding balance and a $10,000 Transfer Fee, a total of $48,948.53, in monthly installments of $4,079.04 from May 15, 2026 through April 15, 2027 (the "Payment Plan").

36. Under Section 3 of the First Amendment, P&M's failure to pay any installment when due terminates the Payment Plan without further notice and makes the entire remaining balance immediately due.

37. P&M paid the May 15 and June 15, 2026 installments. It did not pay the installments due July 15, August 15, or September 15, 2026. The remaining balance of $40,790.45 became immediately due.

*P&M Stops Paying and Stops Reporting*

38. On September 18, 2026, Brian Morgan and Jacob McKeever of the Franchisors' management team met with Wiesehan and Farmer to review the 360 Painting businesses. P&M agreed to provide profit-and-loss statements and operating data from its Housecall Pro scheduling and invoicing account. Morgan confirmed those action items in writing on September 30, 2026. P&M has provided none of them.

39. On September 21, 2026, Wiesehan informed the Franchisors by email that P&M had "changed banks last week" and needed "to change the draw account for fees." P&M had moved its banking without executing a replacement authorization or obtaining the Franchisors' consent.

40. On September 25, 2026, the Franchisors sent P&M the authorization form required to change the account from which the weekly drafts are withdrawn. The same day, Wiesehan asked the Franchisors to "stop the draws next week on the old account," because the drafts were "causing me issues with the account going negative."

41. P&M did not sign the authorization. The weekly drafts for P&M's franchises presented the following week were returned unpaid, and P&M has paid no fees under any Franchise Agreement since September 21, 2026.

42. On October 1, 2026, the Franchisors delivered a written Notice of Default and Demand for Cure (Exhibit 12) by email to the notice addresses on Exhibit C-1 to each Franchise Agreement. The notice identified unpaid fees of $8,392.76 under the 360 Painting Franchise Agreements and P&M's failure to execute a replacement draft authorization, and gave P&M ten days to cure.

43. Three minutes after the notice was delivered, Wiesehan replied by email: "Happy to cure now and change to the new account effective immediately." That reply confirmed receipt of the notice under Section 26. Six minutes later, the Franchisors sent P&M two replacement authorizations, one for the 360 Painting franchises and one for the Grout Medic franchises. Wiesehan acknowledged them: "Great thank you!" P&M never signed either one.

44. On April 17, 2026, the director of ClearSignal Business Advisors, through which the Franchisors provide their Accounting and Business Advisory Services program, notified P&M that, following the execution of its new Franchise Agreements, it was required to use those services. P&M did not respond. On October 2, 2026, he repeated that notice. On October 5, 2026, Wiesehan replied, "this isn't something we'll utilize. We have these services in house," and, after being told that participation was required, "Regardless, we won't utilize the services."

45. On October 5, 2026, the Franchisors delivered Notices of Audit for P&M's franchised businesses, requiring fourteen months of bank statements for every account associated with those businesses by October 15, 2026. P&M did not respond.

46. On October 9, 2026, the Franchisors delivered a Second Notice of Default and Demand for Cure (Exhibit 13). It identified unpaid fees under the 360 Painting Franchise Agreements that had grown to $16,652.33; P&M's failure to deliver monthly financial reports; P&M's refusal to participate in the business advisory program; and P&M's default under the Charleston Payment Plan.

47. The ten-day cure period under the October 1 notice expired on October 11, 2026. P&M did not pay the amounts due and did not sign the replacement authorizations.

48. On September 10, 2026, Wiesehan informed the Franchisors that P&M had been receiving payments since August 31, 2026 on commercial painting jobs dating back to June 2026 and had not yet recorded that revenue. He wrote that "[p]rior to" recording it, he wanted "to get aligned on a payment plan to get these royalties paid," and he proposed to exclude "drywall work" from Royalty. He reported "about $500k - $750k in commercial work booked for the balance of the year" and "several more going into next year."

49. On September 14, 2026, the Franchisors told P&M that drywall and wall-finishing work are part of Gross Sales and asked for the total values and payment schedules of P&M's commercial projects. On information and belief, P&M has never reported those receipts as Gross Sales or paid Royalty on them.

50. P&M has continued to accept the Franchisors' customer leads while paying nothing. Between September 21, 2026 and the filing of this Complaint, the Franchisors' contact center scheduled at least fifty-seven estimates for P&M's franchised businesses, of which P&M reported winning at least eleven, worth $65,146.10.

*Defendants Open a Competing Painting Company in P&M's Own Office*

51. While the Franchise Agreements remained in force, Defendants caused a competing painting business, operating as "Harding & Company," "Harding and Company," and

"Harding Company Partners," to begin offering painting services to the public. On information and belief, Norris organized one or more Harding entities in 2026, and Wiesehan and Norris own, manage, or perform services for them.

52. Harding & Company's website, www.hardingandcompany.com, carries a 2026 copyright notice and lists its address as 2201 Crownpoint Executive Drive, Suite G, Charlotte, North Carolina 28227. That is P&M's own office suite and the notice address the Franchisors use for P&M.

53. The website offers "Interior painting," "Exterior painting," and "Commercial painting," and states that "Harding Company Partners handles interior, exterior, and commercial painting." It identifies the painting service area as "Greater Charlotte NC, Pinehurst NC, Columbia SC, Greenville SC, Lake Norman NC and nearby communities." Each of those markets is, or is within twenty miles of, a Protected Territory that 360 Painting granted to P&M.

54. Harding & Company also advertises drywall installation, drywall repair, and texture matching, which are wall-finishing services. On information and belief, Harding & Company books estimates through Housecall Pro, the same scheduling and invoicing platform P&M uses to operate the franchised businesses. True and accurate captures of the Harding & Company website are attached as Exhibit 14.

55. Harding & Company is a Competitive Business within the meaning of Section 18.1. Each Defendant's ownership of, management of, or service to Harding & Company during the term of the Franchise Agreements violates Section 18.1(i). On information and belief, Defendants have used the Franchisors' leads, customer information, and confidential operating information to market and perform Harding & Company's work, in violation of Sections 18.2 and 18.3.

56. P&M also continued to hold itself out as offering holiday lighting services under the name "Infinity Lights," including on the voicemail greeting for its franchised businesses, without having executed any 2026 Holiday Lights Program addendum.

*The Infinity Holiday Lights Program*

57. Section 8.2 of each 360 Painting Franchise Agreement provides that any new modification, concept, process, improvement, or slogan the franchisee develops in the operation or promotion of the business or the System is a work made for hire and becomes the Franchisor's sole and exclusive property, which the Franchisor may use or allow other franchisees to use without compensation to the franchisee, and requires the franchisee to execute any instrument the Franchisor requests to evidence that ownership.

58. Beginning in the fall of 2024, after P&M had become a 360 Painting franchisee, holiday lighting services were offered through 360 Painting's System and promoted to 360 Painting's customers. 360 Painting allowed Wiesehan to pilot those services in and around Charlotte, North Carolina, as part of P&M's franchised business. Wiesehan created a website for the program, and P&M participated again in the 2025 holiday season.

59. 360 Painting administers its Holiday Lights Program by written addendum to a franchisee's franchise agreement. In each addendum, the franchisee acknowledges that "Franchisor has developed a program for certain franchisees to earn additional revenue by performing services relating to installing, removing, and maintaining lighting and other decorative systems for customers of its franchised business"; agrees that it participates "as part of its franchised business"; agrees that all program "rules, policies, directions, fees, requirements, and instructions . . . shall be determined in Franchisor's sole discretion"; and agrees that all program revenue "shall be treated as 'Gross Sales' under the Franchise Agreement." A true and accurate copy of the Holiday Lights Program Addendum that Vesper Management Group, Inc., the

Pinehurst franchisee owned by Wiesehan Jr. and Belinda Wiesehan, executed effective May 5, 2025 is attached as Exhibit 18.

60. In or around August 2026, P&M transferred to 360 Painting the internet domain used for the Infinity Holiday Lights program, without requesting or receiving compensation. P&M now asserts that it owns the intellectual property associated with that program and demands payment for it.

*The Pinehurst Surrender Agreement*

61. Before P&M acquired the Pinehurst territory, Vesper Management Group, Inc. ("Vesper") operated it under a 360 Painting franchise agreement effective December 21, 2020, as amended on February 9, 2022, March 22, 2023, and February 15, 2024 (the territory so defined, the "Former Pinehurst Territory"). Wiesehan Jr. and Belinda Wiesehan each owned fifty percent of Vesper, and each signed that franchise agreement's Guaranty and Personal Covenants.

62. Effective November 5, 2025, 360 Painting, Vesper, Wiesehan Jr., and Belinda Wiesehan entered into a Surrender of Rights and Mutual Release (the "Surrender Agreement"), attached as Exhibit 17, in connection with an asset purchase transferring the Pinehurst business. The parties' mutual releases expressly exclude "the covenants and obligations arising under this Release."

63. In the Surrender Agreement's noncompete covenant, Wiesehan Jr. and Belinda Wiesehan each agreed that, for two years after closing, neither will "either directly or indirectly, for itself or themselves, or through, on behalf of, or in conjunction with any person or entity, own, manage, operate, maintain, engage in, be employed by, advertise, promote in any media including social media platforms, or consult with or have any interest in a Competitive Business," located in the former Pinehurst territory, within 25 miles of it, inside the territory of any other 360 Painting business, or within 25 miles of any such territory. They further agreed not to "divert, or attempt to

divert, any business or customer of the former Franchised Business or any other 360 Painting® business."

64. Since the Pinehurst transfer, Wiesehan Jr. has continued to participate in the business operated from P&M's office suite. He attends P&M's weekly calls with the Franchisors and has told the Franchisors' personnel that he is again engaged in that business. On information and belief, Wiesehan Jr. and Belinda Wiesehan have engaged in, assisted, promoted, or consulted with Harding & Company, which offers painting services in Pinehurst, North Carolina and in or near the territories of other 360 Painting businesses, and have participated in diverting customers of 360 Painting businesses to it.

*Termination*

65. By letter dated October 14, 2026 (Exhibit 15), delivered by email on October 14, 2026 and by overnight courier to P&M and to each Guarantor, the Franchisors terminated all ten Franchise Agreements, effective on delivery (the "Termination Date"). P&M's counsel acknowledged receipt of the letter in writing on October 14, 2026. The letter states independent grounds for termination, including:

(a) P&M failed to cure, within ten days after written notice, its failure to pay amounts owed to the Franchisors, § 19.3(i)(a);

(b) P&M failed to make three or more payments within a twelve-month period, including the three missed Charleston installments, § 19.2(xxiv);

(c) P&M defaulted under the Franchise Agreements three or more times within a twelve-month period, § 19.2(xxii);

(d) P&M and its Bound Parties breached Section 18 by owning and operating a Competitive Business during the term, § 19.2(xvii);

(e) P&M's default under each Franchise Agreement entitled the Franchisors to terminate every other agreement between them, § 19.2(xxiii); and

(f) P&M abandoned the Grout Medic Gastonia and Rock Hill franchised businesses, § 19.2(iii).

66. P&M operated the Grout Medic Gastonia and Rock Hill franchised businesses as a single unit and never opened the Grout Medic Pinehurst franchised business.

67. The October 14 letter also gave each Guarantor written notice of P&M's defaults and demanded payment under the Guaranty, and demanded P&M's compliance with its post-termination obligations under Section 20.1.

68. Upon termination, P&M was required, among other things, to cease all use of the Franchisors' marks and to stop holding itself out as a current or former franchisee; to pay all sums owing; to return all confidential materials; to refrain from using any customer data of the franchised businesses; to assign to the Franchisors, on demand, the telephone numbers, listings, website addresses, and email addresses used in the businesses, as P&M agreed in the Internet Web Sites and Listings Agreements and Telephone Listing Agreements attached to each Franchise Agreement; to post a warranty bond or pay the warranty fee within fourteen days; and to comply with the post-term covenants in Section 18. § 20.1(i)–(xiii).

69. Termination did not relieve P&M of any obligation, debt, or liability under the Franchise Agreements. § 20.2 (2024 and early-2025 forms); § 20.3 (later forms).

*Damages*

70. As of October 9, 2026, P&M owed $16,652.33 in unpaid fees under the 360 Painting Franchise Agreements, plus unpaid fees under the Grout Medic Franchise Agreements, plus additional weekly fees accruing through the Termination Date, late fees, and interest at 1.5% per month under Section 5.3.

71. P&M owes the $40,790.45 accelerated balance of the Charleston Payment Plan, with interest.

72. P&M stopped performing the Franchise Agreements before the Termination Date. It stopped the weekly fee drafts, refused to execute replacement authorizations, stopped reporting, refused the audit, and diverted painting work in its territories to Harding & Company. As a result of P&M's failure to operate the franchised businesses for the remainder of their terms, the Franchisors have lost the profits they would have earned over those terms.

73. The Royalty alone, at the $150 weekly minimum P&M guaranteed, yields not less than $691,650 over the 4,611 weeks that remained in the ten Initial Terms after October 15, 2026. That figure is a floor. It excludes Royalty at six percent of P&M's actual Gross Sales, the Franchisors' net profits on Contact Center and Technology services, and Royalty on Gross Sales diverted to Harding & Company, all of which the Franchisors will prove at trial. A schedule of these amounts is attached as Exhibit 16.

74. The Franchisors have incurred and continue to incur attorneys' fees and costs to enforce the Franchise Agreements and the Guaranties, which Defendants must reimburse under Section 28, Section 20.1, and each Guaranty.

75. Defendants' ongoing operation of a competing painting business in P&M's territories, using P&M's office and the goodwill and customer relationships built under the Franchisors' marks, is causing the Franchisors irreparable harm. It deprives the Franchisors of the ability to re-franchise the territories, confuses customers who know the business as a 360 Painting franchise, and erodes goodwill that money damages cannot measure.

*Conditions Precedent*

76. All conditions precedent to the Franchisors' claims have been performed, have occurred, or have been waived or excused. The Franchise Agreements' pre-suit mediation

provisions apply "with the exception of injunctive relief or specific performance actions," § 27.2(ii) (360 Painting); § 27.1(ii) (Grout Medic), and expressly permit a party to begin litigation "in order to request an injunction from a Court of competent jurisdiction to prevent irreparable harm." Counts III and IV seek injunctive relief and specific performance.

77. On October 9, 2026, P&M served a written notice invoking the Franchise Agreements' pre-suit mediation process, and on October 14, 2026, the Franchisors served their own Mediation Notice. The Franchisors are participating in that process as to Counts I, II, and V and will move to stay those Counts pending its completion.

**COUNT I**
**BREACH OF THE FRANCHISE AGREEMENTS**
*(by 360 Painting and Grout Medic against P&M)*

78. The Franchisors incorporate the preceding paragraphs.

79. Each Franchise Agreement is a valid and enforceable contract supported by consideration. The Franchisors performed their obligations under each of them.

80. P&M breached the Franchise Agreements by, among other things:

(a) failing to pay Royalties, Marketing Fund Contributions, Contact Center Fees, and Technology Fees when due, §§ 4.2, 4.3, 4.6, 4.7, 5.1;

(b) changing the account from which the drafts were withdrawn without authorization, failing to fund the weekly drafts, and refusing to execute the replacement ACH Authorizations, § 5.2;

(c) failing to pay the Charleston Payment Plan installments and the accelerated balance, First Amendment § 3;

(d) failing to deliver monthly financial reports, § 6.3;

(e) failing to record and report Gross Sales, including commercial revenue, and to pay Royalty on them, §§ 4.2, 4.4, 6.3;

(f) refusing to participate in the Accounting and Business Advisory Services program, §§ 4.9, 6.1;

(g) failing to produce records in response to the Franchisors' audit, § 6.4;

(h) owning and operating a Competitive Business and diverting customers during the term, §§ 18.1(i), 18.2, 18.3;

(i) permitting a competing business to operate from the franchised businesses' office without consent, § 21;

(j) failing to operate the franchised businesses for the full term, § 27.4; and

(k) failing to perform its post-termination obligations, § 20.1.

81. As a direct result, the Franchisors have suffered damages in an amount to be proven at trial, but not less than $749,092.78, consisting of $16,652.33 in pre-termination fees under the 360 Painting Franchise Agreements as of October 9, 2026, the $40,790.45 Charleston balance, and not less than $691,650 in lost Royalty profits, together with additional unpaid fees, late fees, contractual interest, net lost profits on services, Royalty on diverted Gross Sales, and attorneys' fees and costs.

**COUNT II**
**BREACH OF GUARANTY**
*(by 360 Painting and Grout Medic against Wiesehan, Norris, and Farmer)*

82. The Franchisors incorporate the preceding paragraphs.

83. Each Guarantor executed a Guaranty for each Franchise Agreement, personally, absolutely, unconditionally, and jointly and severally guaranteeing P&M's payment and performance of every obligation under that Franchise Agreement.

84. P&M has failed to pay and perform as set out above. Each Guaranty requires the Guarantor to cure a monetary default within five business days after notice. The October 1 and October 9, 2026 notices of default were delivered to each Guarantor, and the October 14, 2026

letter demanded payment under each Guaranty. More than five business days have passed since each Guarantor received notice of P&M's monetary defaults, and no Guarantor has cured them.

85. Each Guarantor is jointly and severally liable to the Franchisors for all amounts P&M owes, in an amount to be proven at trial but not less than $749,092.78, together with attorneys' fees and costs.

**COUNT III**
**BREACH OF RESTRICTIVE COVENANTS AND PERSONAL COVENANTS**
*(by 360 Painting against all Defendants; injunctive relief)*

86. The Franchisors incorporate the preceding paragraphs.

87. Section 18 of each Franchise Agreement, and each Guarantor's Personal Covenants, prohibit Defendants from owning, managing, or performing services for a Competitive Business within the Protected Territories or within twenty miles of them or of the primary office of any other 360 Painting business, during the term and for two years after termination; from diverting or soliciting the franchised businesses' customers; and from using the Franchisors' confidential information, including customer information.

88. These covenants are reasonable in duration, geography, and scope. They protect the Franchisors' legitimate interests in their goodwill, customer relationships, confidential information, and ability to re-franchise the territories, and they restrict Defendants only from the same services in the same markets for a limited time.

89. Defendants breached and are breaching these covenants by owning, operating, managing, and performing services for Harding & Company, which offers painting services in and around the Protected Territories from P&M's own office suite, and, on information and belief, by using the Franchisors' leads, customer information, and confidential operating information to do so.

90. The Franchisors have no adequate remedy at law. The harm to their goodwill, customer relationships, and ability to re-franchise the territories is continuing and cannot be measured in money. Defendants agreed that, for any actual or threatened breach of Section 18, the Franchisors are entitled to an injunction, without bond, and that the post-term restriction is tolled during any breach. § 18.1(iv).

91. The Franchisors are entitled to preliminary and permanent injunctive relief enjoining each Defendant, and all persons in active concert or participation with them, from violating Section 18 and the Personal Covenants for two years from the later of the Termination Date or the date Defendants come into compliance.

## COUNT IV
## SPECIFIC PERFORMANCE OF POST-TERMINATION OBLIGATIONS
*(by 360 Painting and Grout Medic against P&M)*

92. The Franchisors incorporate the preceding paragraphs.

93. Section 20.1 of each Franchise Agreement, and the Internet Web Sites and Listings Agreement and Telephone Listing Agreement attached to each, obligate P&M upon termination to cease use of the Franchisors' marks, to return confidential materials, to refrain from using customer data, and to assign to the Franchisors on demand the telephone numbers, directory and online listings, website addresses, email addresses, and online business profiles used in the franchised businesses.

94. The Franchisors have demanded performance. The telephone numbers, listings, and online profiles associated with the franchised businesses are unique assets tied to the Franchisors' marks and customer goodwill, and damages are not an adequate remedy for P&M's failure to transfer them.

95. The Franchisors are entitled to an order compelling P&M to perform each obligation in Section 20.1 and in the listing agreements, including the transfer of every telephone

number, listing, website address, email address, and online business profile used in the franchised businesses.

**COUNT V**
**DECLARATORY JUDGMENT**
*(by 360 Painting against P&M; 28 U.S.C. § 2201)*

96. The Franchisors incorporate the preceding paragraphs.

97. An actual controversy exists between 360 Painting and P&M concerning ownership of the concept, brand, domain, and other intellectual property associated with the Infinity Holiday Lights program. P&M asserts that it owns that property and is entitled to payment for it. 360 Painting denies both assertions.

98. Under Section 8.2 of each 360 Painting Franchise Agreement, any modification, concept, process, improvement, or slogan P&M developed in the operation or promotion of the franchised business or the System is a work made for hire and the sole and exclusive property of 360 Painting, which 360 Painting may use and license to other franchisees without compensating P&M.

99. In addition, P&M released 360 Painting and its affiliates from all claims arising out of any prior or existing franchise relationship in the General Releases it executed with the Lake Norman Franchise Agreement on June 21, 2025, and with the Grout Medic Pinehurst, Columbia, Greenville, and Charleston Franchise Agreements on March 13, March 27, and April 24, 2026. In the Temporary Fee Amendments executed on May 17, 2026, P&M and each Guarantor released The Grout Medic and its affiliates from all claims arising out of or related to "Franchisee's Business" and "the business relationship between Franchisor and Franchisee" that occurred on or before that date.

100. 360 Painting is entitled to a declaration that (a) the concept, brand, domain, and associated intellectual property of the Infinity Holiday Lights program are the sole and exclusive

property of 360 Painting; (b) P&M is not entitled to compensation for them; (c) P&M must execute any instrument 360 Painting requests to evidence that ownership; (d) P&M has no right to offer holiday lighting services under the Infinity name; and (e) the identity and contact information of customers served through the program are 360 Painting's confidential information.

**COUNT VI**
**BREACH OF THE SURRENDER AGREEMENT**
*(by 360 Painting against Wiesehan Jr. and Belinda Wiesehan)*

101. The Franchisors incorporate the preceding paragraphs.

102. The Surrender Agreement is a valid and enforceable contract supported by consideration, including 360 Painting's release of Vesper, Wiesehan Jr., and Belinda Wiesehan and its consent to the Pinehurst transfer. 360 Painting performed its obligations under it.

103. The Surrender Agreement's noncompete and non-diversion covenants are reasonable in duration, geography, and scope, and protect 360 Painting's goodwill and customer relationships in the Pinehurst territory and its other franchised territories.

104. Wiesehan Jr. and Belinda Wiesehan breached and are breaching those covenants by engaging in, assisting, promoting, or consulting with Harding & Company, a Competitive Business operating in and within 25 miles of the former Pinehurst territory and the territories of other 360 Painting businesses, and by diverting or attempting to divert customers of 360 Painting businesses.

105. 360 Painting has no adequate remedy at law for this continuing harm to its goodwill and customer relationships, and is entitled to preliminary and permanent injunctive relief enforcing the Surrender Agreement's noncompete and non-diversion covenants, together with its damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, the Franchisors respectfully request that the Court enter judgment in their favor and against Defendants, jointly and severally, and:

a. Award compensatory damages in an amount to be proven at trial, but not less than $749,092.78, inclusive of prejudgment interest at the contractual rate of 1.5% per month or, alternatively, under Va. Code § 8.01-382;

b. Preliminarily and permanently enjoin each Defendant, and all persons in active concert or participation with any of them, from owning, managing, operating, or performing services for any Competitive Business, including Harding & Company, Harding and Company, and Harding Company Partners, within the Protected Territories or within twenty miles of them or of the primary office of any other 360 Painting business, for two years from the later of the Termination Date or the date of compliance, and from soliciting or diverting the franchised businesses' customers or using the Franchisors' confidential information;

c. Order P&M to perform each obligation in Section 20.1 of the Franchise Agreements and in the listing agreements, including transfer of every telephone number, listing, website address, email address, and online business profile used in the franchised businesses;

d. Declare that the concept, brand, domain, and associated intellectual property of the Infinity Holiday Lights program are the sole and exclusive property of 360 Painting, that P&M is not entitled to compensation for them, and that P&M has no right to offer holiday lighting services under the Infinity name;

e. Order an accounting of all Gross Sales of P&M, Harding & Company, and any other business through which Defendants have offered painting, grout, or holiday lighting services since January 1, 2026;

f. Award the Franchisors their reasonable attorneys' fees, accountants' fees, and costs under Section 28 and Section 20.1 of the Franchise Agreements and each Guaranty;

g. Preliminarily and permanently enjoin Wiesehan Jr. and Belinda Wiesehan from violating the Surrender Agreement's noncompete and non-diversion covenants, including by engaging in, assisting, promoting, or consulting with Harding & Company or any other Competitive Business in the areas it restricts; and

h. Grant such other and further relief as the Court deems just.

Dated: October 16, 2026

Respectfully submitted,

**360 PAINTING, LLC**
**THE GROUT MEDIC, LLC**
By Counsel

*/s/ Evan D. Mayo*

Evan D. Mayo (VSB No. 89383)
Stephen J. McDonald (VSB No. 101256)
MAYO LAW GROUP PLLC
425 Locust Avenue, Suite 201
Charlottesville, Virginia 22902
Telephone: 434.951.2222
Facsimile: 434.951.0666
evan@mayolawgroup.com
stephen@mayolawgroup.com

*Counsel for Plaintiffs*

**DISCLOSURE AND CERTIFICATION REGARDING USE OF GENERATIVE ARTIFICIAL INTELLIGENCE**

Undersigned counsel discloses that Claude, a generative artificial intelligence tool developed by Anthropic, PBC, was used in the preparation of this Complaint. Undersigned counsel certifies that counsel has independently verified and checked the accuracy of every portion of this Complaint drafted by generative artificial intelligence, including all citations to legal authority and the propositions for which those citations are offered.

*/s/ Evan D. Mayo*
Evan D. Mayo